■ In the Matter of the CITY OF NEW YORK, Respondent-Appellant, Relative to Acquiring Title to Real Property for a Project Known as Conference House Park Addition in the Borough of Staten Island. BUTLER MANOR ASSOCIATES, Appellant-Respondent. — In a condemnation proceeding, the parties cross-appeal from a decree of the Supreme Court, Richmond County (Ventiera, J.), entered December 6, 1979, which awarded claimant $525,617 for the City of New York's acquisition of certain real property owned by claimant. Claimant's renewed motion to dismiss the City of New York's cross appeal or, in the alternative, to require the city to withdraw its brief and serve a brief in conformity with the CPLR and this court's rules, is granted to the extent of striking the three appendices of the city's brief and all assertions in the brief based on those appendices. Those appendices are not part of the record on appeal. Motion otherwise denied. Decree reversed, on the law, with costs to the

claimant, and new trial granted, in accordance herewith. The property taken was part of a 56.004-acre (2,439,545 square feet) tract of land — including land under water — allegedly owned by claimant. Claimant's title to said tract is not disputed except for 16,920 square feet of underwater land shown on claimant's Exhibit C-1 (survey). Damage Map No. 3735 (Sheet No. 12) shows that the taking was that part of claimant's real property designated on the Land Map of the Borough of Richmond (Staten Island) as Block 7710, Lot 400, and as Damage Parcels Nos. 290, 290-S, 290-AD, 290-W and 290-WE in this proceeding. The land acquired consists of unimproved upland and land underwater, which is irregular in shape. The upland is bounded by Raritan Bay on the south, Clermont Avenue on the north, Mount Loretto on the east, and lands of others on the west. Damage Map No. 3735 (Sheet No. 12) lists the areas taken:

| Damage Parcel No. | Parcel | Upland Taken | |
|---|---|---|---|
| 290 | A | 335,702 sq. ft. | |
| 290-S | F | 67,945 sq. ft. | |
| 290-AD | | 1,513 sq. ft. | (637,550 sq. ft. not taken) |
| | Total | 405,160 sq. ft. | |
| | | Land Underwater | |
| 290-W | A | 74,150 sq. ft. | to bulkhead line |
| 290-WE | G | 298,997 sq. ft. | beyond bulkhead line |
| | Total | 373,147 sq. ft. | |

In effect the 56.004-acre (2,439,545 square foot) tract which claimant asserts it owned and which it claims was damaged, directly and indirectly, may be deemed divided, for the purposes of these cross appeals, into three segments. Segment No. 1, consists of 23.94 acres (1,042,710 square feet) of vacant land located between Clermont Avenue (which runs east-west) and Raritan Bay, a portion (405,160 square feet) of which segment was condemned in the instant proceeding as Damage Parcels Nos. 290, 290-S and 290-AD. Also taken was 373,147 square feet of land underwater (Damage Parcels 290-W and 290-WE). Segment No. 2 (approximately 4½ acres) consists of lands located south of Hylan Boulevard (which here runs east-west) and north of Flower Avenue (which runs east-west), on both sides of Butler Boulevard (which runs north-south). Claimant also owns Flower Avenue. Segment No. 3 consists of certain lands (approximatly 15 acres) located north of Hylan Boulevard on both sides of Butler Boulevard. The distance between Segment Nos. 1 and 2 is 510.50 feet. However, they are connected by Butler Boulevard, which is owned by claimant. Claimant does not own the portion of land west and east of Butler Boulevard between Clermont Avenue and Flower Avenue. Butler Boulevard is a partially paved but open street, on which claimant had been paying taxes through the years. Segment Nos. 2 and 3 are divided only by Hylan Boulevard. Claimant's 56.004-acre tract was zoning R3-1 residence district, a classification which permitted erection of one and two-family detached and semidetached homes, as well as planned unit developments, condominiums, and/or community facilities and accessory uses. Approximately 830 to 840 one-family or condominium units could have been put on the tract. Claimant's appraiser reported (without controversion) that "the highest and best use for subject

property would be a condominium complex whereby all of the inhabitants of the development could enjoy the beach and all the waterfront uses." It is manifest that all three segments of claimant's land had waterfront view and that Segment No. 1 provided an actual waterfront usage. The testimony further established that the grades were "excellent", with the drop from the high point to the waterfront providing "excellent" drainage for storm water and sanitary sewers, and with Raritan Bay providing a potential outlet for sanitary waste to be treated in a sewage treatment plant that could be readily located by Raritan Bay. Although the land was vacant, claimant had applied for but was denied permission to build a sewage treatment plant. It is also significant that claimant's predecessor in title had dredged the underwater portion of the tract in or about 1966, 1967 and "[m]aybe part of 1968". Approximately 12 inches of fill was left on the land for the entire length of the beachfront for at least 200 to 300 feet back from the high water mark. Other dredged material was removed. Thus, the record contains evidence that the claimant's tract was ideal for condominium development, all three segments having a waterfront view — Segment No. 1 having actual direct waterfront usage and Segment Nos. 2 and 3 having access to the waterfront via the Butler Boulevard connection (owned by claimant) to Segment No. 1. The sewage treatment plant application constitutes some evidence that the first tentative steps towards development of the tract had been taken. In 1973 the State Department of Environmental Conservation prepared a report listing the Princess Bay area of Raritan Bay as among the best clam harvesting areas. Claimant's shellfish expert testified that "the clams were there and could have been harvested * * * had they been put through a depuration plant". As we have noted, the taking was of 373,147 square feet of Segment No. 1 land under water and of 405,160 square feet of Segment No. 1's 23.94-acre (1,042,710 square feet) vacant upland. Claimant's expert asserted that claimant's precondemnation ownership consisted of 2,439,545 square feet. This included a 16,920 square foot underwater portion of a parcel shown as "Parcel F" on claimant's survey of lands which it owned. The 16,920 square foot portion, however, was not listed in the damage map tabulation of lands owned by claimant. Claimant's expert assigned "before" values of $3 per square foot to claimant's upland; 90 cents per square foot to the land under water between the bulkhead line and the shore line; and 30 cents per square foot to the underwater land beyond the bulkhead line. He asserted that the taking resulted in a 10% devaluation to the upland, i.e., the "before" value of $3 per square foot was diminished to an "after" value of $2.70 per square foot for Segment Nos. 2 and 3 and for the remainder of Segment No. 1. He calculated that claimant had incurred total damages of $1,880,500 (rounded) consisting of direct damages of $1,387,000 and severance damages of $493,500. However, although claimant's expert's comparable sales were 2½ to 10 miles from the subject property, his adjustments did not include any adjustment for location; his rationale, in effect, was that the sales were locationally comparable. Further his net adjustments contain a range of minus 32% to plus 41%, a spread of 73%. The city's appraiser valued the 373,147 square foot underwater segment at $74,650, and, by a before and after approach, valued the 405,160 square foot of taken vacant upland at $235,000. Thus, his total damage valuation was $309,650. He did not consider Segment Nos. 2 and 3, asserting that Segment No. 2 was not contiguous to Segment No. 1, and noting that Segment No. 3 was north of Hyland Boulevard. His written report contains no comparables or any explanation whatsoever of the means by which he derived his valuations. The trial transcript shows, however — and we find — that at the trial (in Oct., 1978) claimant's counsel stipulated to permit the city to file

and exchange its comparables but that, subsequently, when he was denied a request for an adjournment with respect to presentation of claimant's direct case, he "withdrew" the stipulation. Thereafter, the city offered its comparables into evidence, but claimant's counsel objected on the ground that the *voir dire* disclosed the "newly developed" fact that the city's comparables had been in its possession since 1974 and were thus not newly discovered evidence. The trial court then sustained claimant's objection, but did so merely on the ground that the city's comparables had not been (timely) served. In view of claimant's earlier stipulation, Special Term should have allowed the city's comparables into evidence. Nevertheless, the city's placement of those comparables into appendices to its brief and its comments on the comparables were improper and that matter, including all three appendices, must be stricken. We find that the city's appraiser's report and testimony demonstrate — and the city's brief so concedes — that the city's expert improperly reduced his Segment No. 1 damage calculation by augmenting his Segment No. 1 remainder "after" square foot value by the benefit purportedly resulting from frontage along a new street (Surf Avenue) to be constructed as part of the city's improvement of the condemned property. The city's brief concedes that this improperly reduced the award for the property actually taken by $138,100. Special Term, noting claimant's wide range of adjustments of comparables, the distance of those comparables from the subject tract and claimant's failure to make adjustments for location, concluded that claimant's expert's comparables "are not comparable to the subject property". The court then, in effect, eliminated the *city's* appraisal by noting that "Mr. Fetner's comparable sales * * * were not marked into evidence * * * Therefore, the court cannot and did not give consideration to them." The court then concluded that: "This court does not subscribed [*sic*] to Mr. Master's [claimant's appraiser] appraisal theory in this proceeding, that is, finding a value for the total land owned by the claimant. Further, this court has not been able to establish Mr. Master's claimed 16,920 square feet 'under the water in front of the parcel' and for that reason makes no award for the same. The court is in agreement with Mr. Fetner [city's appraiser] that claimant's property south of Hylan Boulevard should be considered and valued on a Before and After Value. To arrive at its decision, the court viewed the property prior and subsequent to the trial; it carefully read the transcribed testimony, affording proper weight to the appraisal reports and exhibits marked into evidence. This court has heard testimony of various claimant's and City's real estate experts as to value, and made awards, for numerous damage parcels in the subject proceeding and finds it is qualified to arrive at values for the damage parcels in issue. Based on all of the foregoing, the court finds the market value of the acquired property, as of title vesting date to be:

| | |
|---|---|
| Before | $1,258,799 |
| After | 733,182 |
| Total damages including severance damage | $ 525,617 |

and awards that sum to the claimant herein as just compensation." The court's decision thus does not set forth before or after square foot values, analyze or make findings with respect to the issue of severance damages to Segment Nos. 2 and 3 or otherwise sufficiently explain its award and its reasoning. Under the circumstances described, including the defects in the city's appraiser's approach, the fact that his comparables were not *in evidence*, and the complexity of the evidence and issues, we are unable to effectively and rationally make new findings (cf. *Matter of Willowbrook Assoc. v Finance Administrator of City*

*of N. Y.,* 77 AD2d 901), except, on a default basis, which we decline to do, considering Special Term's failure to provide us with reviewable findings. Although on cross-examination of the city's expert, some testimony was elicited with respect to his before and after calculations in regard to *other* parcels in this condemnation proceeding that evidence is too tenuous to support new findings by this court. Accordingly, there must be a new trial, after which a new determination must be made on all issues. That determination should set forth, *inter alia,* the court's findings with respect to whether severance damages should be awarded for Segment Nos. 2 and 3 (as well as Segment No. 1) and the amounts thereof if any (see *Strong v State of New York,* 38 AD2d 241 and *Matter of City of New York [Friedman],* 40 AD2d 597, both awarding severance damages; cf. *Homer v State of New York,* 36 AD2d 333, affd 30 NY2d 723, denying consequential damages to a parcel separated by a highway). Since there is to be a new trial, claimant, who had placed into evidence a survey, deed and testimony on the issue of the ownership of the 16,920 square feet of "Parcel F" underwater lands, may adduce further evidence, if so advised, with respect to that parcel. Damiani, J. P., Lazer, Cohalan and Bracken, JJ., concur.